**J. Hilton BROOKS, III Plaintiff**

v.

**UNITED STATES of America, Defendant**

**No. 01–CV–452–JBJ.**

United States District Court, E.D. Kentucky, London Division.

March 11, 2003.

Philip E. Wilson, Wilson Law Office, PLLC, Lexington, KY, for J. Brooks, III.

David E. Middleton, U.S. Attorney's Office, Lexington, KY, Michael J. Salem, Aneida P. Winston, U.S. Dept. of Justice, Tax Div., Washington, DC, for U.S.

## *MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT TO DEFENDANT, UNITED STATES OF AMERICA*

JOHNSON, United States Magistrate Judge.

This matter is before the Court upon cross-motions for summary judgment

(DE# 14, 18). The parties have consented to final disposition before the Magistrate Judge. Having carefully considered the entire record, including the Motions (DE# 14, 18) with supporting memoranda (DE# 16, 19), Affidavit (DE# 15), Responses (DE# 20, 21), and Replies (DE# 23, 24), the undersigned Magistrate Judge finds as follows:

## I. Facts and Procedural History

Plaintiff, Dr. J. Hilton Brooks, III, was on the active medical staff at Pineville Community Hospital as a physician and was a member of the hospital's "quality assurance committee". After the death of a patient, certain concerns were raised at the hospital. While carrying out his committee duties, Dr. Brooks discovered what he determined to be numerous billing improprieties by Pineville Community Hospital and two physicians, Dr. Jerry L. Woolum and Dr. Talmadge Hays. Rather than correcting the improprieties, the hospital rebuffed Dr. Brook's efforts and subjected him to a variety of retaliatory abuses [1].

Dr. Brooks persevered, and through counsel, filed a lawsuit on behalf of the United States under the False Claims Act, asserting that Pineville Community Hospital, Dr. Jerry L. Woolum, and Dr. Talmadge Hays had submitted fraudulent Medicare and Medicaid billings to the government for payment. Initially, the United States declined to intervene. Plaintiff litigated the FCA action through discovery and to a scheduled trial date, when the United States then opted to enter the case [2]. See DE# 1, Exh. 1.

Rather than proceed to trial, defendants agreed to pay a total of $2.5 million dollars to settle the FCA action for fraudulent billing. In a written settlement agreement (# 1) signed on April 18, 1995, defendants expressly admitted that from 1986 to 1995, they had "violated regulations governing Medicare, Medicaid, Federal Black Lung, UMWA Health and Welfare, and CHAMPUS programs in Kentucky relating to payments for authorized procedures and examinations." See DE# 1, Exh. 2, ¶ 1. The settlement agreement also required the defendants to undergo mandatory training in proper billing procedures for Medicare and Medicaid.

The settlement agreement indicated that the defendants were paying the agreed amount of $2.5 million "in full financial settlement and satisfaction of all monetary claims... arising out of the factual scenario alleged in the Amended Complaint." DE# 1, Exh. 2, ¶ 3. On April 19, 1995, the court approved the settlement agreement and granted Dr. Brooks a relator's award of 25% of the recovery. DE# 1, Exh. 5. The settlement agreement specified that the qui tam award would be 25% of the net settlement amount remaining after payment of attorney fees and reimbursable costs of the FCA action. The net dollar amount of the qui tam award was $210,067.30, which resulted in income tax of $78,607.00. See DE# 16, p. 4–5; and see DE# 1, Exh. 8. The calculation of the

---

1. The record reflects that Dr. Brooks was pressured to cease investigating the fraudulent billing practices and to relocate his practice elsewhere. He was threatened with loss of clinical privileges, was reviewed "unfavorably", was advised by the hospital administrator that the Executive Committee has recommended that he not be reappointed to medical staff, and was criticized by defendants in the hospital newsletter for his purportedly "disruptive attitude".

2. 31 U.S.C.A. § 3730(c)(3) provides in relevant part: "If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action.... the court... may nevertheless permit the Government to intervene at a later date upon a showing of good cause."

net amount of the qui tam award is not at issue here.

In addition, a separate settlement agreement (# 2) was signed, setting forth that "it is the desire of Dr. Brooks, the Defendants and Dr. Rader and Dr. Morgan to settle and discharge absolutely all possible claims which might exist between Dr. Brooks and any or all of the Defendants or Dr. Rader or Dr. Morgan upon the terms and conditions set forth herein." DE# 1, Exh. 4, p. 1–2. The defendant hospital agreed, as part of this separate settlement agreement, to pay Dr. Brooks the sum of $300,000.00 for "damages received on account of alleged personal injuries within the meaning of Section 104(a)(2)..." See DE1, Exh. 4, ¶ 1. The document further indicates that in consideration of such sum, Dr. Brooks was releasing the defendant hospital, Dr. Woolum, Dr. Hayes, and two other doctors from any claims, including retaliation and defamation, against them. DE# 1, Exh. 4, ¶ 2. The hospital agreed to withdraw all claims against Dr. Brooks in the pending peer review. DE# 1, Exh. 4, ¶ 5.

Dr. Brooks timely paid federal $78,607.00 in income taxes on the relator award as part of his 1995 income. The separate settlement award of $300,00.00 in compensatory damages for "personal injuries" was excluded from income, with full disclosure to the I.R.S, which approved such exclusion under 26 U.S.C. § 104(a)(2). Dr. Brooks thereafter timely filed Form 1040X for a refund of the $78,607.00 tax he paid on the relator award, asserting that the net amount of the relator award should also be excludable from income under § 104(a)(2). On November 4, 1999, the I.R.S. disallowed Dr. Brooks' claim for refund on the ground that the qui tam relator award was a "reward", and thus, was taxable income. DE# 1, Exh. 9. Dr. Brooks timely filed an administrative appeal, which the I.R.S. denied on October 12, 2001. DE# 1, Exh. 10, 11. On October 31, 2001, Dr. Brooks filed the present federal action, seeking a refund of the income tax he had paid on the qui tam relator award.

## II. Issues Presented

The main issue is whether, for purposes of federal income taxation, the qui tam relator award that plaintiff received upon settlement of the FCA action is excludable from income pursuant to 26 U.S.C. § 104(a)(2).

## III. Procedural Analysis

### Jurisdiction

"Although a taxpayer must first pay the amount in dispute, he may contest his tax liability by way of a refund suit in the appropriate district court or in the Court of Federal Claims...." *Barlow v. Commissioner of Internal Revenue*, 301 F.3d 714, 720 (6th Cir.2002). Such jurisdiction is based upon 28 U.S.C. § 1346(a)(1), which provides that federal district courts have original jurisdiction, concurrent with the United States Court of Federal Clams, of: "Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws."

### Burden

■ The party claiming the tax exemption bears the burden of establishing his entitlement to the exemption based on a specific provision of the tax code. See *Abrahamsen v. United States*, 228 F.3d 1360, 1363 (C.A.Fed.2000), (citing *United States v. Janis*, 428 U.S. 433, 440–41, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976)). In

the present case, Dr. Brooks bears the burden of showing that, for purposes of federal income taxation, his qui tam relator award is excludable from income pursuant to 26 U.S.C. § 104(a)(2). Both the plaintiff taxpayer and the defendant United States have moved for summary judgment.

## Standard for Summary Judgment

Summary judgment is appropriately granted pursuant to Fed. Rule Civ. P. 56(c) when there is no genuine issue as to any material fact, and thus, upon the established facts, the moving party is entitled to judgment as a matter of law. See *Terry Barr Sales Agency, Inc. v. All–Lock Co.*, 96 F.3d 174, 178 (6th Cir.1996). The movant bears the burden of clearly establishing the lack of any triable issue of fact by the record properly before the court, and supporting evidentiary material must be construed most favorably to the non-moving party. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Morgan v. Utica Mutual Insurance Co.*, 229 F.3d 1153, 2000 WL 1276755, *2 (6th Cir.2000).

The party seeking summary judgment bears the initial burden of identifying the portion of the record which demonstrates that there is no genuine issue of material fact, and the non-moving party must thereafter produce specific facts demonstrating that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A dispute about a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bauer v. Montgomery*, 215 F.3d 656 (6th Cir.2000),

quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Cross-motions for summary judgment "authorize the court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties." *Greer v. United States*, 207 F.3d 322, 326 (6th Cir.2000), quoting *Harrison Western Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir.1981).

## IV. Substantive Analysis

In determining whether there are any genuine issues of material fact with respect to this claim for tax refund, it is noted that the basic facts regarding the circumstances of the underlying FCA action, the terms of the two settlement agreements, and the pertinent amount of income tax at stake are not disputed. The issue here is whether the 25% qui tam relator award is "non-taxable compensation" for personal injuries, as argued by the taxpayer, or is "taxable income", as argued by the United States.

The Internal Revenue Code defines gross income as "all income from whatever source derived." 26 U.S.C. § 61(a). Exclusions from gross income are narrowly construed. *United States v. Burke*, 504 U.S. 229, 248, 112 S.Ct. 1867, 1878, 119 L.Ed.2d 34 (1992); *Commissioner of Internal Revenue v. Schleier*, 515 U.S. 323, 327–28, 115 S.Ct. 2159, 2163, 132 L.Ed.2d 294 (1995). Dr. Brooks argues that the net amount of his relator award should be excluded from income under § 104(a)(2). The version of 26 U.S.C. § 104(a)(2) in effect in 1995, and applicable here, provides that: "...gross income does not include—

(2) the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness..."

The rationale underlying such exclusion is the "human capital" principle. The Supreme Court has explained that such principle derives from several early cases that established "that a restoration of capital was not income." *O'Gilvie v. United States*, 519 U.S. 79, 84, 117 S.Ct. 452, 136 L.Ed.2d 454 (1996), citing *Doyle v. Mitchell Bros. Co.*, 247 U.S. 179, 187, 38 S.Ct. 467, 62 L.Ed. 1054 (1918) and *Southern Pac. Co. v. Lowe*, 247 U.S. 330, 335, 38 S.Ct. 540, 62 L.Ed. 1142 (1918). "The statute that eventually became § 104(a)(2) resulted from an extension of the restoration of capital principle to personal injuries....a recovery for personal injury 'merely take[s] the place of capital in human ability which was destroyed by the accident.'" *O'Gilvie*, 519 U.S. at 85–86, 117 S.Ct. 452, citing 31 Op. Atty. Gen. 304, 308 (1918)(recovery of damages for personal injury "aim[s] to substitute for a victim's physical or personal well-being—personal assets that the Government does not tax and would not have taxed had the victim not lost them."). Hence, damages for personal injury are excluded from income because they are compensatory, that is, they are intended to make the person "whole".[3] The Supreme Court has interpreted the term "personal injuries" to include physical and non-physical injuries. *Schleier*, 515 U.S. at 330, 115 S.Ct. at 2164 (" § 104(a)(2) encompasses recoveries based on intangible as well as tangible harms"), citing *Burke*, 504 U.S. at 235, n. 6, 112 S.Ct. at 1871, n. 6; and see, *Burke*, 504 U.S. at 244, n. 3, 112 S.Ct. at 1876, n. 3 (the term "personal injuries or sickness" includes nonphysical injuries).

The implementing Treasury regulation, 26 C.F.R. § 1.104–1(c) (1994), provides that:

"Section 104(a)(2) [of the Internal Revenue Code] excludes from gross income the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness. The term 'damages received (whether by suit or agreement)' means an amount received (other than workmen's compensation) through prosecution of a legal suit or action *based upon tort or tort type rights*, or through a settlement agreement entered into in lieu of such prosecution." (Italic added).

In determining "excludability", the United States Supreme Court has held that:

"...the plain language of § 104(a)(2), the text of the applicable regulation, and our decision in *Burke* establish two independent requirements that a taxpayer must meet before a recovery may be excluded under § 104(a)(2). First, the taxpayer must demonstrate that the underlying cause of action giving rise to the recovery is 'based upon tort or tort type rights'; and second, the taxpayer must show that the damages were received 'on account of personal injuries or sickness'." *Schleier*, supra, 515 U.S. at 336–337, 115 S.Ct. at 2167, citing *Burke*, 504 U.S. 229, 112 S.Ct. at 1871 (finding amount not excludable from income because underlying claim was not based on tort or tort-type rights).

The characterization of damages and their excludability under § 104(a)(2) has resulted in frequent litigation. See H.R. Conf. Rep. No. 104–737, at 300, *reprinted in* 1996 U.S.C.C.A.N. 1677; H.R.Rep. No. 104–586, at 142–43 ("The confusion as to the tax treatment of damages received in cases not involving physical injury or physical sickness has led to substantial litigation"). To address this problem, Congress

---

**3.** Punitive damages are not awarded "on account of personal injuries or sickness", and are not excludable. *O'Gilvie*, 519 U.S. at 79, 117 S.Ct. 452; *Srivastava v. C.I.R.*, 220 F.3d 353, 356 (5th Cir.2000).

amended § 104(a)(2) in 1996 to read "on account of personal *physical* injuries or *physical* sickness." (italics added). See, *Young v. United States*, 2001 WL 1480296, *2 (W.D.Ky.2001)("According to the legislative history that accompanies the [1996] amendments to § 104(a)(2), the Congress sought to establish a uniform policy regarding taxation of damages awards and prevent, or at least reduce, litigation regarding the question of whether or not damage awards were taxable").

■ However, such amended version does not apply to the present case. Dr. Brooks was granted his qui tam relator award in 1995, prior to the 1996 amendment, and his counsel correctly argues that the tax statute in effect at the time of the qui tam award should apply. See *Greer v. United States*, 207 F.3d 322, 328 (6th Cir.2000)(holding that "because the amendment took effect after AOI and Greer executed their agreement, it is not applicable to this case").

Dr. Brooks, through counsel, asserts that "during, and by reason of, his prosecution of the FCA case, Dr. Brooks suffered substantial personal injury arising from, but not limited to, defamation of his business reputation and stress-related emotional and physical injuries". DE# 1, p. 2, ¶ 10. Plaintiff contends that the underlying FCA action was "a tort or tort-like" and that his 25% qui tam relator award derived from the settlement of such claim thus constitutes "damages received ... on account of personal injuries or sickness" within the meaning of 26 U.S.C. § 104(a)(2).

As to whether the underlying cause of action giving rise to the recovery is "based upon tort or tort type rights", the Supreme Court has recognized that a primary characteristic of tort actions is the availability of compensatory damages. *Schleier*, 515 U.S. at 324, 335, 115 S.Ct. at 2161, 2166–2167; *Burke*, 112 S.Ct. at 1871

("one of the hallmarks of traditional tort liability is the availability of a broad range of damages to compensate the plaintiff..."). The primary purpose of the FCA is to ensure that the United States gains restitution of money fraudulently obtained from it. *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 551–52, 63 S.Ct. 379, 87 L.Ed. 443 (1943); *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 1995 WL 811966 (N.D.Ohio 1995), aff'd 142 F.3d 296 (6th Cir.(Ohio)1998). The purpose of the FCA is largely remedial, that is, "to compensate the United States for the fraudulent billing in order to make the United States 'whole'." *Hammond v. Northland Counseling Center, Inc.* 218 F.3d 886, 892 (8th Cir.2000).

■ Even assuming that the FCA action for fraudulent billing was "a tort or tort-like", it was a tort upon the United States, not the relator himself. The "tort" upon the relator is essentially "retaliation", which is separately compensated under § 3730(h) of the FCA. Section 3730(h) provides:

"Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination,

including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection."

The FCA's "whistleblower" provision expressly provides compensation for general and special damages sustained by the relator. *Neal v. Honeywell Inc.*, 191 F.3d 827, 831–32 (7th Cir.1999)(holding that compensation for emotional distress caused by an employer's retaliatory conduct is available under 31 U.S.C. § 3730(h)). Such compensation is in accordance with the FCA's requirement under 31 U.S.C. § 3730(h) that the whistle-blowing employee "be entitled to all relief necessary to make the employee whole." *Hammond*, 218 F.3d at 892–93. Damages under § 3730(h) are intended to compensate the employee for harm caused by retaliation, such as harassment and discharge, and are not a substitute for the separate relator's award that such employee might obtain in the qui tam action. *Neal v. Honeywell Inc.*, 33 F.3d 860, 865 (7th Cir.1994). "Section 3730(h), added to the False Claims Act in 1986, is designed to protect persons who assist the discovery and prosecution of fraud..." *Id.* at 861. Thus, while the action for fraudulent billing is intended to make the United States "whole", "the overarching purpose of.... [31 U.S.C. § 3730(h) ] is.... to provide an aggrieved plaintiff with complete compensation for any injuries incurred as a result of the employer's retaliatory conduct, namely 'all relief necessary to make the employee whole'." *Hammond*, 218 F.3d at 892.

The existence of two separate settlements illustrates this point. Settlement # 2 expressly indicates that it is intended to compensate for Dr. Brooks' claimed personal injuries, whereas settlement # 1 was intended to compensate the United States for the fraudulent billing asserted in the amended complaint. The amount paid to Dr. Brooks under settlement # 2 has already been appropriately excluded from income under 26 U.S.C. § 104(a)(2).

■ Although plaintiff argues that his relator award should also be deemed "compensatory damages" on account of personal injury based on tort or tort type rights', the 25% relator award was derived from settlement of fraudulent billing upon the United States, not a tort upon the relator that resulted in personal injury. Claims regarding any torts upon the relator, and any resulting personal injury, were settled separately (in settlement # 2) with compensatory damages of $300,00.00. Review of the two settlements reflects that the intent of the payor in making two separate settlements was to settle the claims of fraudulent billing against the United States in one and the personal claims of Dr. Brooks in the other. The fact that Dr. Brooks was granted a statutory percentage of the United States's settlement for his contribution to the prosecution does not transform such recovery into one "on account of personal injuries". See e.g., *Cook v. United States*, 243 F.3d 561, 2000 WL 1471620 (Fed.Cir.)(granting summary judgment to United States and denying claim for tax refund, because amount received in settlement "was not designed to compensate for her specific injuries"); *Reisman v. Commissioner of Internal Revenue*, 3 Fed. Appx. 374, 2001 WL 111616 (6th Cir.)(finding taxpayer not entitled to exclusion because, even if underlying claim was a tort, the settlement was not "on account of personal injury").

The United States asserts that a relator award is a "reward" for the relator's contribution to a successful prosecution of an FCA action for fraud upon the government, rather than a settlement of claims for the relator's personal injuries. The language of the statute itself supports such interpretation. The FCA, in Section § 3730(d)(1), provides in relevant part: "If

the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, *depending upon the extent to which the person substantially contributed to the prosecution of the action"*. (Italics added).

The False Claims Act (FCA) was originally enacted in response to defrauding of the federal government by suppliers during the Civil War, and in more recent times, by the rampant defrauding of the government by defense contractors. See Rep. No. 99–345, 99th Cong. 2nd Sess. (1986). The legislative history indicates that the qui tam provisions are intended "to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward." H.R. Rep. 660, 99th Cong., 2nd Sess. 23 (1986); see also, e.g., *U.S. ex rel. Roby v. Boeing Co.,* 995 F.Supp. 790 (S.D.Ohio 1998). This supports the characterization of the relator award as a "reward". The qui tam provisions of the FCA enable private individuals to sue in the name of the United States and to share in any proceeds recovered. *In re Schimmels,* 85 F.3d 416 (9th Cir.1996).

The express language of the separate settlement agreements indicates what claims were settled by each agreement. See DE# 1, Exh. 2, ¶ 8. Settlement agreement # 1 expressly indicated that the defendants were paying the agreed amount of $2.5 million to the United States "in full financial settlement and satisfaction of all monetary claims...arising out of the factual scenario alleged in the Amended Complaint." DE# 1, Exh. 2, ¶ 3. Settlement agreement # 2 expressly indicated that the defendants were paying the agreed amount of $300,000.00 to Dr. Brooks because "it is the desire of Dr.

Brooks, the Defendants and Dr. Rader and Dr. Morgan to settle and discharge absolutely all possible claims which might exist between Dr. Brooks and any or all of the Defendants or Dr. Rader or Dr. Morgan upon the terms and conditions set forth herein." DE# 1, Exh. 4, p. 1–2. The defendant hospital agreed to pay Dr. Brooks the sum of $300,000.00 for "damages received on account of alleged personal injuries within the meaning of Section 104(a)(2)..." See DE1, Exh. 4, ¶ 1. The document further indicates that Dr. Brooks was releasing the defendant hospital, Dr. Woolum, Dr. Hayes, and two other doctors from any claims, including retaliation and defamation, against them. DE# 1, Exh. 4, ¶ 2, 5.

■ "[I]t is the nature of the settled claim itself which controls whether any of the settlement constituted compensation for a torttype personal injury." *Metzger v. Commissioner,* 88 T.C. 834, 847, 1987 WL 49302 (1987), *aff'd,* 845 F.2d 1013 (3rd Cir.1988); *Glynn v. Commissioner,* 76 T.C. 116, 119, 1981 WL 11320 (1981), *aff'd,* 676 F.2d 682 (1st Cir.1982). A claim for fraudulent billing under the False Claims Act includes the following elements: (1) the defendants made a claim against the Government; (2) the claim was false or fraudulent; and (3) the defendants knew the claim was false or fraudulent. 31 U.S.C.A. § 3729; and see, *United States v. Southland Management Corp.,* 288 F.3d 665 (5th Cir.2002). Personal injury to the relator is not an element of such cause of action, nor are any compensatory damages for such claim calculated on the basis of personal injury.

The amount the United States received under settlement # 1 was paid in compromise of the fraudulent billing claims. The relator's award derived from that settlement was statutorily provided as a reward for the relator's contribution to the FCA action, rather than an amount received in

compromise of his own claim for personal injuries. See *Alexander v. I.R.S.,* 72 F.3d 938, 942 (1st Cir.1995) ("amounts received in compromise of a claim must be considered as having the same nature as the right compromised"); *Riley v. St. Luke's Episcopal Hosp.,* 252 F.3d 749, 769 (5th Cir.2001)(discussing the type of claim pursued by a relator in an FCA action, in which a private citizen sues "to vindicate an injury to the government and is rewarded with a share of the recovery"). Significantly, the FCA provides for the award of separate damages for retaliation suffered by the whistleblower, and Dr. Brooks did in fact receive a separate settlement of $300,000.00 for damages due to his own personal injuries.

The parties discuss *Greer v. United States,* 207 F.3d 322, 325 (6th Cir.2000) at length. There, Ashland had fired its environmental compliance officer (Greer) for truthfully reporting environmental violations. In lieu of litigating a wrongful discharge action (a tort under state law), it paid Greer a large amount over and above the usual amount of severance pay. Ashland withheld taxes from the entire settlement amount. In 1996, Greer filed for a tax refund, arguing that the settlement proceeds were excludable from income pursuant to 26 U.S.C. § 104(a)(2). In reviewing the grant of summary judgment to the defendant, the Sixth Circuit Court of Appeals held that the additional payment beyond the usual severance pay was in lieu of the taxpayer's wrongful discharge claim, but remanded to determine whether such payment was actually made "on account of personal injuries".

Such case is readily distinguishable from the present case because, even assuming that Dr. Brooks suffered personal injury in pursuing the FCA action, the record reflects that no part of the payment under settlement # 1 was "on account of such personal injuries". The settlement of the FCA claims was based on the amount of the false medical billing. Nothing in the record suggests that the amount of settlement # 1 ($2.5 million) was calculated, based on, or "on account of", any individual injuries of Dr. Brooks. The claims of fraudulent billing and the amount of settlement # 1 were not dependent on the existence or extent of any personal injuries to Dr. Brooks. See *Schleier,* 515 U.S. at 330, 115 S.Ct. 2159; see also, e.g., *Abrahamsen v. United States,* 228 F.3d 1360, 1363 (C.A.Fed.2000)(finding settlement payment was not due to "personal injury").

The 25% relator award paid to Dr. Brooks out of settlement # 1 was not "on account of" his personal injury, but rather, was a reward for his contribution to the FCA action. His "contribution" to the action is not the fact that he undoubtedly suffered stress and retaliation in pursuing the action, but rather, the value of the information and other assistance he provided to the prosecution of the case. The relator's personal injuries, such as emotional distress and stress-related physical injury, were separately compensated.

Plaintiff alternatively argues that a *portion* of his relator award may be deemed compensation for "personal injuries" under the version of 26 U.S.C. § 104(a)(2) in effect in 1995 and that a genuine issue of material fact exists as to what portion of the relator award is excludable from income. Plaintiff asserts that, in cases where the government has intervened [4],

---

4. Although the plaintiff does not concede that the "government proceeded" with the action in the underlying FCA action, and hence, disputes that his relator award was made pursuant to § 3730(d)(1), rather than § 3730(d)(2), such distinction is not "material" to the pres-

ent action for tax refund. In any event, the record reflects that the government did intervene. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported mo-

the False Claims Act allows the court to award the relator from 15% to 25% of the settlement amount. The plaintiff points to several cases from other circuits where courts awarded the maximum 25% relator award and indicated that the whistleblower plaintiff had suffered 'personal expense' in pursuing the case. Plaintiff argues that the relator award was therefore "on account of personal injuries" suffered in pursuing the FCA action.

However, as already discussed, the fact that the relator suffered stress and personal expense in connection with his pursuit of the FCA action does not mean that settlement # 1, or the relator award derived from settlement # 1, were "on account of personal injuries". Most plaintiffs suffer significant stress and expense in pursuing legal actions, but such fact does not transform the nature of the action into one based on personal injuries. Under the plain language of the statute, the relator is rewarded with a percentage of the settlement with the United States due to his contribution to the action. See e.g., *United States v. Blue Cross and Blue Shield of Florida*, 882 F.Supp. 166 (1995)("the maximum recovery is reserved for situations where the relator actively and uniquely aids the government in the prosecution of the case.").

The defendant hospital paid $2.5 million to the United States under settlement # 1 in order to resolve claims that it had fraudulently billed the United States. Dr. Brooks received a statutory 25% relator's award from such proceeds for his contribution to the prosecution. The defendant hospital separately paid $300,000.00 to Dr. Brooks under settlement # 2 in order to resolve claims of personal injury by Dr. Brooks. Hence, the relator award is not subject to exclusion under § 104(a)(2).

Accordingly,

It is **ORDERED** that:

a) the "Motion for Partial Summary Judgment" (DE# 14) by plaintiff is **DENIED**;

b) the "Motion for Summary Judgment" (DE# 18) by defendant is **GRANTED**.

A separate Judgment will enter on this date.

---

tion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505 (1986)(italics in original).

Section § 3730(d)(1) provides in relevant part: "**If the Government proceeds** with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action......Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant".

Section § 3730(d)(2) provides that: "**If the Government does not proceed** with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant..."